**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Eric Wilim, individually and on behalf of all others similarly situated, | 1:21-cv-06855 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Mondelēz Global LLC, | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.      Mondelēz Global LLC ("Defendant") manufactures, labels, markets, and sells Honey Wheat crackers under the Ritz brand ("Product").



2.     The relevant front label representations include "Honey Wheat," "5g whole grain per 16g serving," a honey dipper, and stalks of wheat.

I.     **CONSUMERS VALUE WHOLE GRAINS**

3.     Whole grains are associated with numerous health benefits.

4.     The 2015-2020 Dietary Guidelines for Americans recommend that at least half of all grains eaten should be whole grains.

5.     The Dietary Guidelines recommend consuming 48g of whole grains per day.

6.     However, Americans are consuming less than 16g of whole grains per day.

7.     It is recommended that individuals over 9 eat at least three to five daily servings of whole grains, at 16g per serving.

A.     Consumers Expect Fiber From Whole Grains

8.     The average person needs 28 grams of fiber per day.

9.     Dietary Guidelines promote whole grains as an important source of fiber.

10.    87% of consumers try to consume more whole grains and 92% try to get more fiber.

11.    Research proves that consumers seek whole grains because they want more fiber.

12.    In surveys, more than 60% of consumers stated they want to consume more whole grains to improve their digestive health, which is reflective of a desire to increase fiber intake.

13.    Almost 75% of consumers who are presented front label claims that a product is made with, or contains whole grains, will expect that food to be at least a good source of fiber – 10% of the daily value.

14.    Almost 70% of consumers agree with the statement that whole grains are one of the best sources of fiber.

15.    62% of consumers agree that foods made from whole grains are one of the best

sources of fiber.

16.     46% of consumers rely on foods with whole grains for their daily fiber needs.

17.     Based on the proven connection with fiber, whole grain statements do more than tell consumers a product contains a type of grain ingredient.

18.     At least half of consumers expect that for every gram of whole grain per serving, there will be at least a gram of fiber.

19.     The survey revealed that almost half of consumers who viewed a claim like that on the Product, that a food contains 5 grams of whole grains per serving, would deliver at least 5 grams or more of fiber per serving.

20.     This is based on the Nutrition Facts, which reveals the Product is not a good source of fiber, as it indicates less than one gram of fiber, or 3% of the daily value, per serving.

| Nutrition Facts | |
|---|---|
| about 24 servings per container | |
| **Serving size** | **5 crackers (16g)** |
| **Amount per serving** | |
| **Calories** | **80** |
| | **% Daily Value\*** |
| **Total Fat** 4g | **5%** |
| Saturated Fat 1g | **5%** |
| *Trans* Fat 0g | |
| **Cholesterol** 0mg | **0%** |
| **Sodium** 110mg | **5%** |
| **Total Carbohydrate** 10g | **4%** |
| Dietary Fiber less than 1g | **3%** |
| Total Sugars 2g | |
| Includes 2g Added Sugars | **4%** |
| **Protein** less than 1g | |
| Vitamin D 0mcg | 0% |
| Calcium 20mg | 0% |
| Iron 0.5mg | 2% |
| Potassium 30mg | 0% |
| \* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice. | |

21.     The survey showed that consumers are misled by claims like that on the Product where the food fails to deliver the expected amount of fiber.

B. Labeling Whole Grain Claims

22.     Epidemiological studies have shown that the minimum meaningful amount of whole grains deserving of mention in front-of-pack labeling is 8g per serving.

23.     This figure is one-sixth of the 48g of whole grains people should consume daily.

24.     The Product states, "5g whole grain per 16g serving."

25.     However, this does not tell consumers how much of the Product's grain is refined grains.

26.     Even if consumers review the ingredients, which list "Unbleached Enriched Flour" ahead of "Whole Grain Wheat Flour," they will not learn the relative amount of refined and whole grains.

**INGREDIENTS:** UNBLEACHED ENRICHED FLOUR (WHEAT FLOUR, NIACIN, REDUCED IRON, THIAMINE MONONITRATE {VITAMIN B1}, RIBOFLAVIN {VITAMIN B2}, FOLIC ACID), WHOLE GRAIN WHEAT FLOUR, CANOLA OIL, SUGAR, PALM OIL, HONEY, LEAVENING (CALCIUM PHOSPHATE, BAKING SODA), SALT, SOY LECITHIN, ARTIFICIAL FLAVOR, NATURAL FLAVOR.

INGREDIENTS: UNBLEACHED ENRICHED FLOUR (WHEAT FLOUR, NIACIN, REDUCED IRON, THIAMINE MONONITRATE {VITAMIN B1}, RIBOFLAVIN {VITAMIN B2}, FOLIC ACID), WHOLE GRAIN WHEAT FLOUR, CANOLA OIL, SUGAR, PALM OIL, HONEY, LEAVENING (CALCIUM PHOSPHATE AND/OR BAKING SODA), SALT, SOY LECITHIN, ARTIFICIAL FLAVOR, NATURAL FLAVOR.

27.     Consumers are unable to know what percent of the weight of the serving size of the Product is attributable to grain content compared to the Product's other ingredients.

28.     The result is consumers unknowingly consume more of the Product to get more whole grains, even though they will end up consuming excess refined grains.

29.     Consumption of substantially more refined grains than whole grains is inconsistent with dietary guidelines to "make half your grains whole."

30.     Without knowing how many grams of refined grain are in the Product, consumers

cannot determine whether half their grains are whole.

31.    Upon information and belief, the amount of whole grains to refined grains in the Product is approximately 25%, based on a rough calculation from the Nutrition Facts.

32.    Since one serving of the Product contains only 5g of whole grain, three servings would be 15 g of whole grain, significantly less than what the Dietary Guidelines recommend, not just for one day, but for one serving of whole grains.

33.    The front label does not disclose the percentage of whole grains provided in a serving compared to what the dietary guidelines recommend of 48g whole grains per day.

34.    A recent study has shown that consumers are misled by the name, "Honey Wheat," and expect a food bearing this statement has more whole grains than it does.

35.    Consumers believe that "honey wheat" is a type of wheat, which has more whole grains than regular, refined wheat.

C.    The Small Amount of Honey Furthers Impression Product Contains More Whole Grain than it Does

36.    Consumers associate darker hues in grain products with a significant amount of whole grain ingredients.

37.    Though the Product contains honey purportedly for a sweetening effect, the honey is also used to impart a darker color.

38.    The Product's color would be significantly lighter if based solely on the ratio of refined grains to whole grains.

39.    According to expert W.K. Nip, the presence of "mostly reducing sugars in [honey's] sugar profile" causes it "[to] brown[s] easily during baking, adding a natural dark color to baked

products such as bread, crackers, and other products."[1]

40.     This small amount of honey contributes to consumers getting the misleading impression the Product contains more whole grains than it does.

## II.     HONEY IS MISREPRESENTED AS MAIN SWEETENER

41.     The representations convey that honey is the primary and/or a significant source of sweetener ingredients used in the Product are misleading.

42.     However, the Product is sweetened primarily with conventional sugars and contains a miniscule amount of honey.

A.  Sugar Disfavored as Sweetener

43.     In 2014, the National Institutes of Health cautioned, "experts agree that Americans eat and drink way too much sugar, and it's contributing to the obesity epidemic. Much of the sugar we eat isn't found naturally in food but is added during processing or preparation."[2]

44.     The NIH noted further: "[s]everal studies have found a direct link between excess sugar consumption and obesity and cardiovascular problems worldwide."[3]

45.     There has long been a consensus among doctors and nutritionists that "[e]ating too much sugar contributes to numerous health problems, including weight gain, Type 2 diabetes, dental caries, metabolic syndrome and heart disease, and even indirectly to cancer because of certain cancers' relationship to obesity."[4]

46.     In addition, "there is emerging research that suggests high-sugar diets may increase

---

[1] W.K. Nip et al., eds. *Bakery products: science and technology*, Ch. 7, "Sweeteners," John Wiley & Sons, 2006.
[2] NIH, Sweet Stuff: How Sugars and Sweeteners Affect Your Health, October 2014.
[3] *Id.*
[4] Marlene Cimons, Eating too much sugar can hurt your health, and for some it's actually addictive, Washington Post December 16, 2017.

6

the risk of developing [dementia]."[5]

47.    As part of a societal trend toward consuming healthier and natural foods, avoidance of added sugar has been and remains a significant consumer preference, with consumers strongly favoring honey as a sugar substitute.

48.    In August 2016, an article in "Prepared Foods" magazine noted that "[o]ngoing concerns about obesity and sugar intake have driven interest in reduced sugar and diet drinks in recent years."[6]

49.    As another observer of the food industry explained in May 2017, "[h]ealth concerns and better educated consumers are propelling the demand for sugar reduction across food and beverage categories. . . Sugar reduction will be one of the top marketing claims prominently featured on products in the coming year…"[7]

50.    Similarly, an article in the February 28, 2018, edition of "Food Business News" reported that "[s]peakers addressing consumer trends at the International Sweetener Colloquium in Orlando on February 13 said sugar avoidance was a macro trend 'that is here to stay and will only increase.'"[8]

51.    The same article noted that "I.R.I. [Information Resources, Inc.] surveys show that 58% of consumers across generations are avoiding sugar. . . [and of] those avoiding sugar, 85% are doing so for health reasons and 58% for weight concerns."[9]

[5] Kieron Rooney, Yes, too much sugar is bad for our health – here's what the science says, The Conversation, March 8, 2018.
[6] PreparedFoods.com, Trends in Sugar Reduction and Natural Sweeteners, August 24, 2016.
[7] Laura Dembitzer, Less is More: Sugar Reduction, Less Sodium & Low-FODMAPS in Food, Beverage, Food Insider Journal, May 09, 2017.
[8] Ron Sterk, Avoidance of sugar remains macro trend, Food Business News, February 28, 2018
[9] Id.

B. <u>Consumer Preference for Products Sweetened with Honey Instead of Sugar</u>

52.     Surveys show "[c]onsumers rated honey at 73% 'better for you than sugar.'"[10]

53.     A survey in "Prepared Foods" magazine noted that: (i) "93% of consumers consider honey to be a natural sweetener;" (ii) "58% of consumers with one or more children look for honey on the product label;" (iii) "60% of consumers between the ages of 18 and 34 look for honey on the product label; and (iv) about half of consumers would pay at least 5% more for food bars, ready-to-drink tea, and yogurt primarily sweetened with honey."[11]

54.     Referring to food products perceived as healthier, the Huffington Post reported that "[a]ccording to a 2015 Nielsen survey of 30,000 people, 90% of shoppers are willing to pay more for the added quality and benefits" these foods and ingredients provide.[12]

55.     Honey fits all these criteria, as a naturally occurring substance and, unlike sugar, has small amounts of nutrients such as vitamins, minerals, enzymes, and antioxidants.

56.     In addition, honey has a lower glycemic index than sugar, causing slower fluctuations in blood sugar and therefore in insulin levels.

57.     Rapid spikes of blood sugar lead to quick spurts of energy followed by sharp declines characterized by tiredness, headaches, and difficulties in concentrating ("low blood sugar").

58.     Although sugar contains slightly fewer calories than honey by weight, honey is much sweeter than sugar and therefore less is needed to achieve the same level of sweetness.

59.     Based on the common marketplace perception that honey is healthier and more natural than sugar, consumers place a greater value on products that are sweetened with honey instead of sugar and are willing to pay a higher price for such products.

---

[10] *Id.*
[11] Supra, Trends in Sugar Reduction and Natural Sweeteners.
[12] Brian Kennell, <u>Healthy Food Trends Drive New Products</u>, HuffingtonPost.com, October 1, 2015, updated December 6, 2017.

C. Contrary to Representations, Honey is Present in De Minimis Amount and Product Is Sweetened Mainly with Sugar

60. The Product's ingredients, listed in descending order of predominance, reveal that "Sugar" is the predominant sweetening agent, followed by "Palm Oil," and *then* "Honey."

61. The Product has more palm oil than honey, yet the front label does not disclose the presence of palm oil.

62. Consumer preference is for foods which get their taste from food ingredients – like honey – instead of added "honey" flavor, because it is perceived as more natural and less processed than a flavor solution made by a chemist in a laboratory.

63. The amount of honey is misleading because it is present in a smaller amount than expected.

64. At best, honey *may* provide a slight "honey" taste.

65. However, because there is such a small amount of honey, it is insufficient to provide such a taste.

66. No less than 70% of consumers try to avoid added flavors, because even "natural" flavors have been linked to detrimental health effects, contain additives, and made with environmentally harmful solvents.

67. Unfortunately for consumers, what consumers may recognize as a "honey" taste is not entirely from honey, but from the natural and/or artificial flavor listed in the ingredient list.

68. The front label fails to disclose the Product is natural and/or artificially honey flavored, even though this statement is required under federal and state law.

69. The added flavors imitate honey, causing consumers to expect it has more honey than it does.

70. Consumers are misled to expect a non-negligible amount of honey because they see

the honey dipper and the word "honey."

## III.  CONCLUSION

71.    The Product contains other representations which are misleading.

72.    Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

73.    The value of the Product that Plaintiff purchased was materially less than its value as represented by defendant.

74.    Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

75.    Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

76.    The Product is sold for a price premium compared to other similar products, no less than approximately $2.99 per 13.7 oz, a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

77.    Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

78.    The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

79.    Plaintiff Eric Wilim is a citizen of Illinois.

80.    Defendant Mondelēz Global LLC, is a Delaware limited liability company with a principal place of business in East Hanover, Morris County, New Jersey and upon information and

belief, at least one member of defendant is not a citizen of the same state as the plaintiff.

81.     Defendant's managing member is Mondelēz International, Inc., a Virginia corporation with a principal place of business in New Jersey.

82.     Defendant transacts business within this District through sale of the Product at stores within this State and District, including big box stores, convenience stores, drug stores, grocery stores, club stores, and online, sold directly to residents of this District.

83.     Venue is in this District because plaintiff resides in this district and the actions giving rise to the claims occurred within this district.

84.     Venue is in the Eastern Division in this District because a substantial part of the events or omissions giving rise to the claim occurred in Lake County, i.e., Plaintiff's purchase of the Product and his awareness of the issues described here.

Parties

85.     Plaintiff Eric Wilim is a citizen of Grayslake, Lake County, Illinois.

86.     Defendant Mondelēz Global LLC, is a Delaware limited liability company with a principal place of business in East Hanover, New Jersey, Morris County.

87.     Defendant's products, including the Product in this action, are sold to consumers by third-parties, available online and in almost every convenience store, grocery store, big box store, drug store in Illinois.

88.     The Product is sold in packaging of various sizes.

89.     Defendant's managing member is Mondelēz International, Inc., a Virginia corporation with a principal place of business in New Jersey.

90.     The forerunner of Mondelez was the National Biscuit Company, formed in 1898 from a merger of over 100 bakeries in the country.

91. Nabisco, as it was called, revolutionized packaged snacks through wrapping which maintained freshness and kept out debris.

92. Prior to this, crackers were sold loose in a barrel, which is where the term "cracker barrel" comes from.

93. Nabisco introduced numerous staples of American pantries, including Oreo Cookies, Barnum's Animal Crackers, Honey Maid Grahams, Ritz crackers, Wheat Thins, Saltines, and Chips Ahoy.

94. Nabisco was the second largest advertiser after tobacco companies for much of its history, which created a great reservoir of public trust.

95. Nabisco, and its successor, Defendant, emphasizes its commitment to quality products, labeled honestly, in support of giving consumers the high value they deserve.

96. These facts show a company with a significant amount of goodwill and equity when it comes to consumer purchasing.

97. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Walmart, 1205 S Rte 31 Crystal Lake IL 60014-8213 between December 2020 and July 2021, among other times.

98. Plaintiff bought the Product because he expected it contained more whole grains, fiber, and honey, than it did because that is what the representations said and implied.

99. Plaintiff relied on the words and images on the Product, on the labeling and/or claims made by Defendant in digital and/or social media.

100. Plaintiff bought the Product at or exceeding the above-referenced price.

101. Plaintiff would not have purchased the Product if he knew the representations and omissions were false and misleading or would have paid less for it.

102.   Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

103.   The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

104.   Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance the Product's representations are consistent with its abilities and/or composition.

105.   Plaintiff is an unable to rely on the labeling of not only this Product, but other similar products, because he is an unsure of whether their representations are truthful.

<u>Class Allegations</u>

106.   Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged.

> **Consumer Fraud Multi-State Class**: All persons in the States of Ohio, Michigan, Nevada, Arizona, Rhode Island, North Dakota, Texas, Iowa, Virginia, New Hampshire, Maine, Alaska, South Dakota, and Oklahoma, who purchased the Product during the statutes of limitations for each cause of action alleged

107.   Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

108.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

109.   Plaintiff is an adequate representative because his interests do not conflict with other members.

110.   No individual inquiry is necessary since the focus is only on defendant's practices

and the class is definable and ascertainable.

111. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

112. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

113. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.</u>

<u>(Consumer Protection Statute)</u>

114. Plaintiff incorporates by reference all preceding paragraphs.

115. Plaintiff and class members desired to purchase a product that contained more whole grains, fiber, and honey, than it did.

116. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

117. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

118. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

119. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

120. Plaintiff relied on the representations that the Product contained more whole grains, fiber, and honey, than it did

121. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

122.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the ICFA and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

123.   Defendant intended that each of members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

124.   As a result of defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the other members of the Consumer Fraud Multi-State Class, have sustained damages in an amount to be proven at trial.

125.   In addition, defendant's conduct showed motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

126.   The Product was manufactured, identified, and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it contained more whole grains, fiber, and honey, than it did.

127.   Defendant directly marketed the Product to consumers through its advertisements and partnerships with retailers, through social media, and in print circulars.

128.   Defendant knew the product attributes that potential customers like Plaintiff were seeking, and developed its marketing to directly meet those needs and desires.

129. Defendant's representations affirmed and promised that the Product contained more whole grains, fiber, and honey, than it did.

130. Defendant described the Product as one which contained more whole grains, fiber, and honey, than it did, which became part of the basis of the bargain that the Product would conform to its affirmation and promise.

131. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

132. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high quality products.

133. Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

134. Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

135. The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable because it was not fit to pass in the trade as advertised and not fit for the purpose for which it was intended.

136. The Product was not merchantable because it was not adequately contained, packaged, and labeled as required by the representations, and did not conform to the promises and affirmations of fact made on the container or label.

137. Defendant had reason to know that the purpose for which the Product was bought by Plaintiff and consumers was because they expected it contained more whole grains, fiber, and honey, than it did, and they relied on Defendant's skill or judgment to select or furnish such a

suitable product.

138.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

139.  Defendant had a duty to truthfully represent the Product, which it breached.

140.  This duty is based on defendant's position, holding itself out as having special knowledge and experience in this area, a trusted company known for its high quality products.

141.  The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant.

142.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

143.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

144.  Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained more whole grains, fiber, and honey, than it did.

145.  Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and/or constructive knowledge of the falsity of the representations.

146.  Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

Unjust Enrichment

147.  Defendant obtained benefits and monies because the Product was not as represented

17

and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

 **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: December 24, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com
